<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

---

ANNE-MARIE CRONIN,

               Plaintiff,

    v.

BOOZ ALLEN HAMILTON, INC.,
JESSICA KOZAK, SUZETTE MITCHELL,
LESLIE ESPOSITO, JOHN DOES 1-10,
JANE DOES 1-10 and ABC
CORPORATIONS 1-10,

               Defendants.

Case No. 3:18-cv-12642 (BRM) (ZNQ)

**OPINION**

---

**MARTINOTTI, DISTRICT JUDGE**

      Before this Court is Defendant Booz Allen Hamilton, Inc.'s ("Defendant") Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(a). (ECF No. 24.) Anne-Marie Cronin ("Plaintiff") opposed the motion (ECF No. 29) and Defendant replied (ECF No. 32). Having reviewed the parties' submissions filed in connection with the motion and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause shown, Defendant's Motion for Summary Judgment is **GRANTED**.

# I.  FACTUAL AND PROCEDURAL BACKGROUND[1]

## A.  Defendant's Background Information

Defendant provides management, technology, consulting, and engineering services to the private sector, as well as domestic and international governments. (ECF No. 24–2 ¶ 1.) It "embraces diversity and non-discrimination as part of its Core Values, strives to ensure equal employment opportunity" and is committed to providing a non-discriminatory workplace. (*Id.* ¶ 2.) It encourages employees to immediately report discriminatory conduct, provides at least nine avenues for employees to do so, and prohibits retaliation for complaining of discriminatory conduct. (*Id.* ¶¶ 3–4.) During Plaintiff's entire employment, Defendant had anti-discrimination and anti-retaliation policies in place. (*Id.* ¶ 5.) These anti-discrimination and anti-retaliation policies covered age discrimination. (*Id.*) For several years prior to Plaintiff's separation, Defendant required each employee be trained on the anti-discrimination and anti-retaliation policies annually. (*Id.* ¶ 6.) Employees were disciplined if they failed to take such training. (*Id.* ¶ 7.) Defendant's internal workforce issues are handled by its "People Services Department," which is composed of its Recruiting, Diversity and Inclusion, Human Resources ("HR"), and Employee Relations ("ER") Divisions. (*Id.* ¶ 8.) HR worked on issues related to performance, salary increases, promotions, and succession planning, while ER worked with the Law Department, and sometimes HR, to handle internal investigations related to Defendant's policies. (*Id.* ¶ 9.)

---

[1] This background is taken from the parties' statements of material facts, pursuant to Local Civil Rule 56.1. (*See* Defendant's Statement of Undisputed Material Facts (ECF No. 24-2); Plaintiff's Response to Defendant's Statement of Undisputed Material Facts (ECF No. 29-1) and; Plaintiff's Statement of Disputed Material Facts (ECF No. 29-2).) To the extent Plaintiffs admit to any material facts stated by Defendant, the Court will cite only to Defendant's Statement of Undisputed Materials Facts and the relevant paragraph number.

## B.     Plaintiff's Employment History

Plaintiff was hired as an HR Generalist on April 19, 2004, which was an associate level position. (*Id.* ¶¶ 10–11.) She reported to Sarah St. Clair ("St. Clair"), a senior associate, and Lillian Pacheco. (*Id.* ¶ 10.) Over the course of about 13 ½ years, the HR Generalist position title changed to "Senior Human Resources Business Partner ("HRBP")," but Plaintiff's level in the HR hierarchy did not change. (ECF No. 24-2 ¶ 12.) Plaintiff remained an associate, as opposed to lead associate or senior associate, throughout her employment, which ended on August 31, 2017.[2] (*Id.* ¶ 13.) During the last five years of Plaintiff's employment, her manager, Robin DuShole ("DuShole") did not express support for promoting Plaintiff, which was "okay" with her.[3] (ECF No. 24-2 ¶ 14.) During the last three years of her employment, Plaintiff's job duties remained largely the same. (*Id.* ¶ 16.) These duties included working "with the Air Force acquisition and logistics team to facilitate performance management and succession planning meetings," assisting "with retention and succession planning issues," advising and counseling "business leaders on how to manage and document employee performance issues," and educating them "on various HR system tools." (*Id.* ¶ 17.) From 2014 to 2016, DuShole formally evaluated Plaintiff's performance through an annual performance review process, which involved Plaintiff's voluntary submission of a self-assessment, as well as management's gathering of feedback from others who worked with Plaintiff before summarizing that feedback in the review. (*Id.* ¶¶ 19–20.)

---

[2] Plaintiff disputes these titles, stating the hierarchy for the HR Business Partner ("HRBP") role consisted of three levels from lowest to highest: Senior Consultant, Associate, and Lead Associate. (ECF No. 29-1 ¶ 13.)

[3] Plaintiff disputes this because while she did not feel there was support for advancement, there was support for her staying in her current role. (ECF No. 29-1 ¶ 14.) Additionally, Plaintiff was fine with maintaining her current level if that was all Defendant wanted. (*Id.*)

In Plaintiff's 2014 performance review, DuShole's "Manager's Input" was complimentary in some respects but also noted Plaintiff should work on her responsiveness and that her communication could be more precise.[4] (*Id.* ¶ 23.) Also, in the 2014 review, DuShole noted there were "perceptions of plaintiff being disorganized" and that "timeliness of task completion should no longer be an issue this year."[5] (ECF No. 24-2 ¶ 24.) Plaintiff agreed with DuShole's summary on her 2014 review. (*Id.* ¶ 25.)

A different supervisor placed Plaintiff on Performance Improvement Plan ("PIP") in September 2013, in part for "ineffective communication and lack of responsiveness" and Plaintiff admitted the PIP was accurate. (*Id.* ¶¶ 26–27.) In her 2013 performance review, Plaintiff received an overall rating of "Partially Meets" and the review noted her lack of attention and insufficient responses to internal clients.[6] (*Id.* ¶ 28.)

DuShole completed Plaintiff's 2015 performance review in February 2016 and while the review was "complimentary," DuShole again addressed Plaintiff's issues with responsiveness to staff emails and administrative tasks.[7] (*Id.* ¶ 31.) Plaintiff's 2016 performance review was

---

[4] Plaintiff denies this statement in so far as Defendant omitted that DuShole found Plaintiff was "a strong HR Business Partner and provides her managers with good recommendations on how to deal with employee relations issues." (ECF No. 29-1 ¶ 23.)

[5] Plaintiff also denies this statement to the extent Defendant omitted that DuShole noted Plaintiff "does a good job of relationship building" and her "input and instincts can be spot on." (ECF No. 29-1 ¶ 24.)

[6] Plaintiff denies this statement and asserts her 2013 Annual Assessment shows she scored "Meets" in 4 of 6 categories and noted her clients were embracing her, her implementation of bi-weekly meetings was praised by her clients, she continued to seek opportunities to improve, and wass fully committed to success. (ECF No. 29-1 ¶ 28; Plaintiff's Annual Performance Reviews (ECF No. 29-7), at 2–3.)

[7] Plaintiff denies this statement to the extent Defendant omitted that DuShole found Plaintiff showed "strong judgment" and came up with thoughtful solutions on "the myriad of employee relations issues." (ECF No. 29-1 ¶ 31; ECF No. 29-7 at 10–14.)

Plaintiff's final annual performance review with Defendant. (*Id.* ¶¶ 32–33.) Overall, the review was positive but DuShole noted Plaintiff needed to be "a little more interactive with leaders on certain initiatives."[8] (*Id.* ¶ 34.) DuShole also noted in the 2016 review: "[n]ext year will come with many changes as we transition to Workday. This could mean a redefining of HR roles so [Plaintiff] might have to decide where her future lies."[9] (*Id.* ¶ 35.)

## C.     The Workday Transition and the HRTC Role

In 2014, St. Clair, who became the Vice President of HR Operations and Technology in or around 2015, recommended Defendant move from a Human Resource Information System ("HRIS") called PeopleSoft, to Workday, a new technology system which had mobile capacities and could better support Defendant's growth. (*Id.* ¶ 36.) Workday provided the business units with "access on demand" to HR information which enabled the business units to perform their own HR transactions, instead of going through an HRBP. (*Id.* ¶ 37.) Plaintiff observed Workday provided the business units with "quicker, faster information, no lag time in getting data and reports," and ensured the data was correct. (*Id.* ¶ 38.) Defendant decided to transition to Workday in 2015 which enabled it to redesign the HRBP role, which primarily provided reactive administrative support and transactional assistance to the business units. (*Id.* ¶ 39.) Defendant redesigned the HRBP role to the Human Resources Talent Consultant ("HRTC") role, which filled the more strategic and

---

[8] Plaintiff denies this statement to the extent Defendant omitted that DuShole noted Plainitff was "very successful in the BES transition and integration," Plaintiff "took several sticky situation[s] to a successful closure" and DuShole was "very pleased with her efforts as [she] believed [Plaintiff] has been impactful." (ECF No. 29-1 ¶ 34; ECF No. 29-7 at 16.)

[9] Plaintiff denies this statement to the extent Defendant omitted that DuShole found Plaintiff "helpful in regards to Talent Planning, 9box placements, promotions and career development actions," that "her efforts in having a positive outcome for 2 Performance Improvement Plans is indicative of her efforts in guiding the leaders in the proper way to handle PIPs," and that her ability to finalize the January SAW was commended by senior leaders. (ECF No. 29-1 ¶ 35; ECF No. 29-7 at 17–19.)

proactive role of an advisor and consultant regarding future business needs.[10] (*Id.* ¶ 39.) HRTCs were to "really understand the business and the leaders that they supported" and "be able to work side by side with those leaders . . . to really help them manage their business" while the more administrative aspects of the HRBP position were transferred to ER or more junior HR administrator positions.[11] (*Id.* ¶ 40.) For example, while an HRBP needed to be aware of pay changes and standard internal ranges for a particular position's level and process those changes, an HRTC would be expected to understand market trends for a particular job population, competitor or geographic area, and provide insight to and influence the business leaders as to what the pay changes should be.[12] (*Id.* ¶ 41.) When Defendant transitioned to Workday, activities performed by an HRBP, like administering and manipulating spreadsheets and data by hand and putting transactions into the system on behalf of the client staff, were available directly to client leaders, so the HRTC's responsibilities "were more strategic in nature" and more time was spent "looking at the talent landscape, the trending, the analysis, and providing recommendations around strategic HR needs for a particular client."[13] (*Id.* ¶ 42.) Because of the reduced reliance on HR staff due to the information accessibility provided by Workday, Defendant expected to reduce HR

[10] Plaintiff denies this statement, asserting Defendant had not defined the HRTC position until May 2017 when the position was first announced. (ECF No. 29-1 ¶ 39; Mitchell's Notes (ECF No. 29-16), at 2–5.)

[11] Plaintiff denies this statement because the HRTC position would still hold many of the duties and responsibilities of the HRBP position. (ECF No. 29-1 ¶ 40; Mitchell Deposition Transcript (ECF No. 29-12), at 46:13-19.)

[12] Plaintiff denies this statement because at the time of the deposition of Leslie Esposito ("Esposito")—one of DuShole's supervisors—the example cited is not referenced in the "Draft" or requisition for the HRTC position and Esposito did not develop the criteria for the HRTC position. (ECF No. 29-1 ¶ 41; Draft HRBP Model (ECF No. 29-14); ECF No. 29-12 at 47:13-16.)

[13] Plaintiff denies this statement in that Defendant omitted the similarities of the HRBP and HRTC positions. (ECF No. 29-1 ¶ 42; ECF No. 29-12 at 46:13-19; 66:9-25; 68:14-27.)

headcount. (*Id.* ¶ 43.) The transformation of the HRBP role occurred over a period of time after Workday's implementation and Defendant appointed Suzette Mitchell ("Mitchell"), a 30-year employee of Defendant who is three years older than Plaintiff, to lead the HR transformation effort. (*Id.* ¶¶ 44–45.)

Mitchell enlisted Jessica Kozak ("Kozak") to assist with the transformation. (*Id.* ¶ 48.) Kozak reported to Mitchell and was a leader in the HR Division. (*Id.* ¶ 48.) On March 16, 2017, Mitchell and Kozak held a conference call with the HRBPs to discuss the transition. (*Id.* ¶ 49.) Plaintiff claims during the call, the HRBPs were told: (1) the total number of HRBPs would be reduced, (2) the HRBP role would change, (3) all of the HRBPs would be able to interview in May for what would become the new position, and (4) either Mitchell or Kozak said "something about bringing in fresh, new blood." (*Id.* ¶ 50.)

Plaintiff admitted the "fresh new blood" comment was made in the context of posting the new position externally as well as internally.[14] (*Id.* ¶ 51.) Mitchell does not recall the phrase "fresh new blood" being used by her or Kozak, and St. Clair never heard or used the phrase either. (*Id.* ¶¶ 52–53.) Mitchell was very transparent about the fact that Defendant would be considering external candidates after considering existing employees.[15] (*Id.* ¶ 54.) Plaintiff never complained

---

[14] Plaintiff denies this statement in that Plaintiff's interpretation of the comment was that it was not a good comment and sounded like Defendant wanted to bring in fresh, new, younger employees. (ECF No. 29-1 ¶ 51; Plaintiff Deposition Transcript (ECF No. 29-5), at 96:8-24.)

[15] Plaintiff denies this statement because none of the emails issued by Mitchell or Kozak indicated Defendant was considering external as well as internal candidates. (ECF No. 29-1 ¶ 54.)

to anyone about the alleged "fresh new blood" comment,[16] never spoke to Mitchell or Kozak about the comment, and did not actually know what the comment meant.[17] (*Id.* ¶¶ 55–57.)

### D.     The HRTC Selection Process

On March 20, 2017, Kozak emailed the HRBPs a working draft of the job description for the evolving HRBO role so they would have several weeks to decide whether they wanted to interview for the position. (*Id.* ¶ 59.) On May 3, 2017, Mitchell and Kozak had another conference call with the HRBPs in which they advised them the new position would be referred to as a "talent consultant," and that it would not be deemed a promotion, but a lateral transfer at the same level. (*Id.* ¶ 62.) On May 5, 2017, Mitchell emailed all of the HRBPs to let them know the HRTC position had been posted internally, and reiterated all of the HRBPs were welcome to apply "for any/all positions." (*Id.* ¶ 63.) Before the Workday transition, Defendant had 46 HRBPs, ranging in ages from 27 to 60. (*Id.* ¶ 67.) 34 HRBPs, including Plaintiff, and one non-HRBP, Randall Rytter, applied for the HRTC position, and the ages of the applicants ranged from 30 to 58. (*Id.* ¶¶ 68–69.)

Mitchell and Kozak, with St. Clair's approval, developed the criteria for the HRTC position, which was to "serve as an internal consultant to business leaders." (*Id.* ¶ 70.) Mitchell and Kozak, along with Barry Connor ("Connor"), then 45 years old and a leader from recruiting services, made the decisions as to who would be retained as HRTCs. (*Id.* ¶ 71.) St. Clair gave final approval of the hiring decisions after the selection process concluded. (*Id.*) HRTCs were expected to have relationships with leaders and influence them by leading with data and using analytics to

---

[16] Plaintiff denies this because she spoke with Demetria Butler, Todd Harris, and Amy Bevan who also found the comment was inappropriate. (ECF No. 29-5 at 98:18-23.)

[17] Plaintiff denies this because she believed the comment sounded like Defendant wanted to bring in some fresh, new employees. (ECF No. 29-5 at 96:8-24.)

drive talent-related initiatives or decisions. (*Id.* ¶ 72.) In evaluating the candidates, Mitchell's team reviewed each candidate's last performance review and was provided with their resumes. (*Id.* ¶ 73.) Mitchell, Kozak, and Connor interviewed each candidate. (*Id.* ¶ 74.) Before the interviews, Mitchell and Kozak spoke with each HRBP's manager about the HRTC role to "get a feel for [Defendant's] business partner core, as compared to the new talent consultant role." (*Id.* ¶ 75.) Mitchell and Kozak asked each manager to rank his or her respective HRBPs against the HRTC role on a scale of one to three, with one being the highest. (*Id.* ¶ 76.) In or around March 2017, DuShole, provided feedback on and ranked three candidates: (1) Plaintiff, then 48; (2) Demetria Butler ("Butler"), then 43; and (3) Patricia Jarrell ("Jarrell"), then 58, which Mitchell contemporaneously memorialized. (*Id.* ¶ 78.) On the "one to three scale," DuShole ranked Plaintiff a "2-."[18] (*Id.* ¶ 79.) DuShole advised Mitchell that Plaintiff can only focus on one big thing at a time, and her responses to clients "falls by the wayside."[19] (*Id.*) DuShole ranked Butler a "2" because Butler had a tough time balancing work and home and indicated she would be better suited for an ER role. (*Id.* ¶ 81.) DuShole ranked Jarell a "1+" and stated she was a "model HRBP." (*Id.* ¶ 82.)

E.    **Plaintiff's Interview for the HRTC Role and the Applicant Pool**

During the week of May 21, 2017, Mitchell, Kozak, and Connor interviewed all 35 internal candidates. (*Id.* ¶ 83.) During each interview, the three asked each candidate the same five questions, and Mitchell memorialized the responses and her impressions of them during and

---

[18] Plaintiff admits this to the extent the rating was given by DuShole. (ECF No. 29-1 ¶ 79.)

[19] Plaintiff denies she can only focus on one big thing at a time or has issues responding to clients since none of these criticisms were included in her final performance review, which was provided to Mitchell. (ECF No. 29-1 ¶ 80; ECF No. 29-7; ECF No. 29-12 at 89:9-11.)

immediately after the interviews. (*Id.* ¶ 84.) The three interviewed Plaintiff on May 24, 2017, via video conference for about one hour. (*Id.* ¶ 85.) Mitchell took notes and gave impressions of the information provided by Plaintiff during and immediately after the interview. (*Id.* ¶ 87.) Mitchell felt Plaintiff failed to distinguish herself in a positive manner from the other HRBPs during the interview and failed to stand out, in relation to the HRTC position. (*Id.* ¶¶ 88–89.) Mitchell also noted Plaintiff was perceived as more of an administrative-type HR person, which did not align well with the new role, and Plaintiff lacked interest in the new role.[20] (*Id.* ¶ 90.) Mitchell felt Plaintiff struggled to provide recent examples of times she personally developed or drove firm-wide changes. (*Id.* ¶ 91.) During her interview, Plaintiff referenced the Road to Success initiative, which had occurred approximately 10 years earlier.[21] (*Id.* ¶ 92.) She also gave an example related to the Leadership Compass Program, from around 2008. (*Id.* ¶ 93.) Plaintiff's reliance on older initiatives in her interview caused Mitchell to question whether Plaintiff understood the need for the pending changes to the HRBP position and an HRTC's role to influence others. (*Id.* ¶ 94.) Mitchell felt Plaintiff's responses during her interview were more tactical, or focused on completing transactions, versus truly driving initiative or change. (*Id.* ¶ 95.) When asked to give an example about how she ensured impact when stepping into a new role or business area, Plaintiff failed to include any discussion of developing and building relationships or how she was able to influence those leaders, which gave Mitchell the impression that Plaintiff was more of a doer than

---

[20] Plaintiff denies this and asserts her performance reviews show her skills were more than administrative and that she had relationships with leaders, guided her leaders, and was impactful. (ECF No. 29-1 ¶ 90; ECF No. 29-7.)

[21] Plaintiff neither admits nor denies this, as she was advised she could use any information and anything she had worked on over the course of her 13.5 years of employment. (ECF No. 29-1 ¶ 93.)

a driver. (*Id.* ¶¶ 97–98.) Mitchell's team considered Plaintiff, then 48, to be less qualified than the successful applicants for the HRTC position and did not select her for the position.[22] (*Id.* ¶ 99.)

In total, there were 21 successful internal applicants for the HRTC position, ranging in age from 30 to 58. (*Id.* ¶ 100.) Mitchell, Kozak, and Connor did not discuss any candidate's age in making the selection decisions.[23] (*Id.* ¶ 101.) The three also did not consider any candidate's salary or tenure with Defendant in making the selection decisions.[24] (*Id.* ¶ 102.) Twelve of the 21 internal applicants selected for the HRTC, or 57.1%, were age 40 or older as of March 1, 2017. (*Id.* ¶ 103.) Three of the successful internal applicants, Jon Paul Akeo, JoAnn Carpenter ("Carpenter"), and Jarell, were older than Plaintiff. (*Id.* ¶ 104.) Carpenter and Jarrell were the two oldest HRBPs to apply for the new positions. (*Id.* ¶ 105.) The third oldest HRBP to apply, Jane Lantz, was rejected for the HRTC role but was retained in another position. (*Id.* ¶ 106.) The successful HRBP group also included two 46-year-olds, one of whom was hired at the age of 45. (*Id.* ¶ 107.)

## F.    Defendant Does Not Select Plaintiff for an HRTC Role

On June 6, 2017, Mitchell, Kozak, and Talent Advisor Lesley Nobleman contacted Plaintiff and the other HRBPs who were not selected to tell them of the decision. (*Id.* ¶ 108.) Thereafter, Plaintiff was asked to transfer her work to Jarrell, then 58 years old. (*Id.* ¶ 109.) Since Plaintiff

---

[22] Plaintiff denies this statement because she was more qualified than Alex Shapero and Harriet Dade-Garvin, who were both under 40 years old. (ECF No. 29-1 ¶ 99; ECF No. 29-16; Mitchell's Interview Notes for Plaintiff for the HRTC Position (ECF No. 29-19); Mitchell's Interview Notes for Alex Shapero for the HRTC Position (ECF No. 29-26).)

[23] Plaintiff denies this statement because it is not supported by evidence submitted in discovery and Defendant had information about the ages of the candidates. (ECF No. 29-1 ¶ 101; List of HRBPs Applying for the HRTC Position (ECF No. 29-10).)

[24] Plaintiff denies this because Defendant had information regarding the salary of its employees. (ECF No. 29-1 ¶ 102.)

was not selected to be an HRTC, she was separated from employment on August 31, 2017.[25] (*Id.* ¶ 110.)

After the internal candidate selection process was completed, Mitchell and Kozak considered external candidates for the HRTC position. (*Id.* ¶ 112.) On August 28, 2017, three days before Plaintiff's separation at age 49, Mitchell and Kozak hired external candidate Sheryl Gingerich at age 48. (*Id.* ¶ 113.) As of August 31, 2017, 63.6% of the HRTCs were age 40 or older. (*Id.* ¶ 114.) Prior to the transition, 65.2% of the HRBPs were age 40 or older. (*Id.* ¶ 115.) By October 31, 2017, Mitchell and Kozak hired three more external candidates as HRTCs. (*Id.* ¶ 116.) Two of the three external candidates hired as HRTCs, Fabio de Faria and Brandie Anslow, were over 40, at ages 44 and 46, respectively. (*Id.* ¶ 117.) By October 31, 2017, the percentage of over-40 HRTCs had risen to 64%. (*Id.* ¶ 118.)

Plaintiff believes she was not selected for the HRTC position because of her age. (*Id.* ¶ 121.) This belief is based on a feeling that she was "pushed out" for several years, and because she believes Defendant "didn't want" certain older employees.[26] (*Id.* ¶ 122.) Plaintiff also believes her age was a factor because some of the under-40 HRBPs who were retained had been hired during the prior two years. (*Id.* ¶ 123.) Plaintiff attributes the feelings of being "pushed out" to "a few" indirect issues with Leslie Esposito ("Esposito"), beginning five years before her separation.[27] (*Id.*

---

[25] Plaintiff denies this statement in that her employment was terminated and not offered any other employment with Defendant. (ECF No. 29-1 ¶ 110.)

[26] Plaintiff also believes she was not selected due to her age because the only individuals not retained by Defendant were over 40, Defendant hired 9 HRBPs who were less than 40 from 2014 up to the HRTC interviews, Defendant announced it sought fresh new blood, and less qualified individuals under age 40 were retained over Plaintiff. (ECF No. 29-1 ¶ 122.)

[27] Plaintiff also felt "pushed out" by the "fresh new blood comment," by being told she could not apply for the HRTC role in New York City, and being denied an opportunity to meet with clients who requested her presence in Oklahoma. (ECF No. 29-1 ¶ 124.)

¶ 124.) During the period of feeling "pushed out," Plaintiff was never disciplined or demoted. (*Id.* ¶ 133.)

Plaintiff admits that no one at Defendant did anything to her that was extreme or outrageous.[28] (*Id.* ¶ 135.) Plaintiff had pre-existing anxiety and depression stemming from a 2013 divorce and does not believe anyone at Defendant intended to cause her any emotional harm. (*Id.* ¶¶ 136–37.) In or about 2012, Plaintiff "had to be out of the office," went on leave, and was prescribed and took Xanax for "severe anxiety" and issues with sleeping. (*Id.* ¶ 138.) Nothing occurred in 2017 that was so traumatic to Plaintiff that forced her to go on leave; she was functional and able to do her job. (*Id.* ¶ 139.) Defendant asserts Plaintiff's physical and emotional effects of her anxiety in 2017 were limited to losing weight, shaking, and trouble sleeping.[29] (*Id.* ¶ 140.) Plaintiff cannot quantify the weight loss or the shaking, and Plaintiff's shaking did not occur "24/7" or "every single day."[30] (*Id.* ¶¶ 141–42.) While Plaintiff does not know how often she had trouble sleeping in 2017, such troubles did not reach the level of her taking Xanax again. (*Id.* ¶ 143.) Plaintiff suffered no physical symptoms.[31] (*Id.* ¶ 144.)

Every individual involved in assessing whether Plaintiff was sufficiently qualified for the HRTC position and/or deciding whether she would get it was either around Plaintiff's age or older.

[28] Plaintiff denies this statement since she believed Defendant laying off workers over 40 was shocking. (ECF No. 29-1 ¶ 135.)

[29] Plaintiff also had overwhelming stress and marked increases in her anxiety symptoms as well as periodic depressive symptoms. (ECF No. 29-1 ¶ 140; Treatment Records from Morgan Murray, PhD (ECF No. 29-30).)

[30] Plaintiff denies this because she testified her shaking could be part of everyday and it was a lot at the end. (ECF No. 29-1 ¶¶ 141–42.)

[31] Plaintiff testified she lost weight, suffered shaking and loss of sleep. (ECF No. 29-1 ¶ 144; ECF No. 29-5 at 241: 21-242:12.)

(*Id.* ¶ 149.) Over 57% of those selected for HRTC positions were over 40, including three of the four oldest candidates, all of whom were older than Plaintiff.[32] (*Id.* ¶ 150.) Defendant asserts Plaintiff struggled to articulate whether the specific practice she challenges regarding her disparate impact claim was the managers' numerical rankings of their HRBPs, or the HRTC selection process as a whole.[33] (*Id.* ¶ 151.) At the time of Plaintiff's termination, the percentage of HRTCs who were over 40 (63.6%) nearly equaled the number of pre-transition HRBPs in that age group (65.2%), with a difference of only 1.6%. (*Id.* ¶ 152.) Plaintiff has no statistical expert in this case. (*Id.* ¶ 153.)

On July 12, 2018, Plaintiff filed a Complaint in the Superior Court of New Jersey, Monmouth County. (ECF No. 1, Ex. A.) Defendant removed this action to this Court on August 10, 2018. (ECF No. 1.) Plaintiff alleged Disparate Treatment under the NJLAD (Count I), Aider and Abettor Liability under the NJLAD (Count II), Disparate Impact under the NJLAD (Count III), and Intentional Infliction of Emotional Distress (Count IV). (*See id.*) On August 31, 2018, Defendant answered the Complaint. (ECF No. 7.) On August 31, 2020, Defendant filed the Motion for Summary Judgment based on all the claims in Plaintiff's Complaint. (ECF No. 24.) On October 19, 2020, Plaintiffs filed an opposition. (ECF No. 29.) On November 9, 2020, Defendant replied. (ECF No. 32.)

---

[32] Plaintiff asserts Defendant fails to acknowledge 100% of those HRBPs that were terminated by Defendant were over 40 and the average age (of termination) was 47.45 years old. (ECF No. 29-1 ¶ 150.)

[33] Plaintiff denies this because she testified the selection process created a disparate impact. (ECF No. 29-1 ¶ 151.)

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Id.* at 331. On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the

nonmoving party's claim." *Id.* Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322–23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

## III.    DECISION

Defendant argues it is entitled to summary judgment on each of Plaintiff's claims. Three of those claims fall under the NJLAD: (1) Plaintiff's disparate treatment claim (Count I); (2) Plaintiff's "aider and abettor liability" claim (Count II); and (3) Plaintiff's disparate impact claim (Count III). Plaintiff also brings a claim for intentional infliction of emotional distress (Count IV). Specifically, Defendant argues (1) Plaintiff's disparate impact claim fails because she cannot establish a prima facie case; (2) her aiding and abetting claim fails for lack of an individual defendant and any discriminatory conduct; and (3) her intentional infliction of emotional distress

claim fails because she cannot establish she was subjected to any extreme and outrageous conduct, or that she suffered any severe emotional distress. (ECF No. 24-1.) The Court will address each claim in turn.

### A. Disparate Treatment (Count I)

Defendant argues Plaintiff's disparate treatment claim fails because she cannot establish pretext. (ECF No. 24-1 at 18–23.) Plaintiff argues summary judgment is inappropriate because "genuine issues of material fact exist as to [Defendant's] violation of the [NJLAD] in its termination of Plaintiff's employment on the basis of her age." (ECF No. 29 at 19.)

The NJLAD prohibits age-based discrimination in employment decisions, stating in pertinent part:

> It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination: . . . [f]or an employer, because of the race, creed, color, national origin, ancestry, *age* . . . to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment . . . .

N.J. Stat. Ann. 10:5-12(a) (emphasis added).

A prima facie case of age discrimination can be established by either "direct or circumstantial evidence." *Arenas v. L'Oreal USA Prod., Inc.*, 790 F. Supp. 2d 230, 235 (D.N.J. 2011), *aff'd*, 461 F. App'x 131 (3d Cir. 2012). "When an employee attempts to prove discrimination [under the NJLAD] by direct evidence, the quality of evidence required to survive a motion for summary judgment is that 'which if believed, proves the existence of a fact in issue without inference or presumption.'" *Sisler*, 723 A.2d at 954 (quoting *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1558 n.13 (11th Cir. 1988)). Direct evidence must "demonstrate not only a hostility toward members of the employee's class, but also a direct causal connection between that

hostility and the challenged employment decision." *Sisler*, 723 A.2d at 954 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989)). Furthermore, when a plaintiff alleging unlawful termination presents direct evidence that his or her age "was a substantial factor in the [termination] decision . . . the burden of persuasion on the issue of causation shifts, and the employer must prove that it would have fired the plaintiff even if it had not considered his age." *Fakete v. Aetna, Inc.*, 308 F.3d 335, 338 (3d Cir. 2002) (citing *Price Waterhouse*, 490 U.S. at 265–66; *see also Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 512-13 (3d Cir. 1997).[34]

Circumstantial evidence of wrongful discharge under NJLAD must be demonstrated through the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Arenas*, F. Supp. 2d at 236. New Jersey courts have adopted the burden-shifting analysis established in *McDonnell Douglas* to NJLAD cases. *See, e.g.*, *Victor v. State*, 4 A.3d at 140–41 (2010) (observing that "employment discrimination claims [under the NJLAD] proceed in accordance with the *McDonnell Douglas* burden-shifting paradigm"); *Viscik v. Fowler Equip. Co.*, 800 A.2d 826, 833 (N.J. 2002) (recognizing that New Jersey "courts have adopted the burden-shifting framework articulated in *McDonnell Douglas* . . . to prove disparate treatment under [NJ]LAD"). Therefore, if a plaintiff establishes a *prima facie* case, "the burden of going forward

---

[34] Plaintiff asserts the "fresh new blood" constitutes direct evidence of age discrimination because "the only existing HRBPs who were not retained by Defendant" were 40 years old or over. (ECF No. 29 at 20–21.) "For a statement to constitute direct evidence, it must reflect a discriminatory animus on the part of a decisionmaker." *Kepple v. GPU Inc.*, 2 F. Supp. 2d 730, 746 (W.D. Pa. 1998) (citing *Armbruster v. Unisys Corp.*, 32 F.3d 768, 778 (3d Cir. 1994)). "[C]omments that do not relate to age on their face cannot by their very nature constitute direct evidence of age discrimination." *Sosky v. Int'l Mill Serv., Inc.*, Civ. A. No. 94-2833, 1996 WL 32139, at *4 (E.D. Pa. Jan. 25, 1996), *aff'd*, 103 F.3d 114 (3d Cir. 1996). Because "[t]he phrase 'new blood' does not on its face relate to age," *Holshue v. Fanelli Window Pros., Inc.*, Civ. A. No. 3:04-2769, 2006 WL 680878, at *3 (M.D. Pa. Mar. 16, 2006), Plaintiff has not presented direct evidence of age discrimination. However, the Court will consider the comment as relevant circumstantial evidence.

shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Viscik*, 800 A.2d at 833. If the employer is able to articulate such a reason, "the burden shifts back to the plaintiff to show that the employer's proffered reason was merely a pretext for discrimination." *Id.*

"There is no single prima facie case that applies to all employment discrimination claims." *Victor*, 4 A.3d at 141. To establish an unlawful termination claim,[35] a plaintiff must "demonstrate (1) that she belongs to a protected class, (2) that she was qualified for the position held, (3) that she was terminated despite adequate qualifications, and (4) a logical basis on which to find that [the defendant's] decision to terminate her was affected significantly by her age." *Arenas*, 790 F. Supp. 2d at 236.

Plaintiff must demonstrate a prima facie case of unlawful discrimination. *Viscik*, 800 A.2d at 833. It is Plaintiff's burden to "demonstrate he or she can meet each of the elements of the prima facie case," *Victor*, 4 A.3d at 141, but that burden is "slight" and "rather modest," *Zive v. Stanley Roberts, Inc.*, 867 A.2d 1133, 1139 (2005). First, she has demonstrated she is part of a protected class, since she was 49 years old when her employment was terminated (ECF No. 24-1 ¶ 113; ECF No. 29-5 at 21:12–13) and courts have applied the NJLAD to plaintiffs over 40 years old. *Wright v. L-3 Commc'ns Corp.*, 227 F. Supp. 2d 293, 298 (D.N.J. 2002) ("Wright is older than forty, as required by the ADEA, and is within the range of 'older' plaintiffs who have benefited from the

---

[35] Plaintiff and Defendant offer slightly different sets of elements required for a prima facie case of unlawful termination. Plaintiff provides the elements for an unlawful termination claim (ECF No. 29 at 21), while Defendant provides the elements for a failure to hire case (ECF No. 24-1 at 18). The Court will apply the prima facie elements for an unlawful termination claim because: (1) those elements track the allegations in Plaintiff's complaint more closely (ECF No. 1 ¶¶ 24–30); (2) Plaintiff devotes sections of her brief arguing she has established a prima facie case for unlawful termination (ECF No. 29 at 21–25); and (3) Defendant's arguments against Plaintiff's disparate treatment claim are mainly that Plaintiff cannot establish pretext—not that she cannot establish a prima facie case. (ECF No. 24-1 at 18–23).

[NJLAD's] prohibition against age discrimination. (citing *Greenberg v. Camden Cnty. Vocational & Tech. Sch.,* 708 A.2d 460, 466 (N.J. Super. Ct. App. Div. 1998) (applying NJLAD to forty-eight year-old plaintiff)). Second, Plaintiff has provided evidence that she was qualified for the HRTC position because: (1) she satisfied the eligibility requirements listed for the HRTC position (*see* ECF No. 29-27 at 2–4); (2) held a degree in HR and worked in HR for over 20 years (ECF No. 29-6 at 2–6); (3) had a record of solid performance throughout her years with Defendant (ECF No. 29-7 at 10–20); (4) had positive performance reviews in the two years preceding the transition to the HRTC role (*see id.*); and (5) was labeled "impactful" by her performance manager, provided clear guidance, and closed several "sticky situations" (*see id.*). Third, Plaintiff has shown she was terminated from her position by Defendant. (ECF No. 1 ¶ 23; ECF No. 29-1 ¶¶ 111, 144, 152.) Fourth, Plaintiff has demonstrated a "logical basis" exists as to whether Defendant's decision to terminate her was based on her age because (1) Defendant stated it was looking for "fresh new blood" (ECF No. 29-5 at 96:8–24); (2) no individual under 40 years old was terminated (ECF No. 29-10); and (3) less qualified candidates for the HRTC position under the age of 40 were selected over Plaintiff (ECF No. 29-26 at 2–6). Defendant does not argue Plaintiff has not established a prima facie case of unlawful discrimination. (ECF No. 24-1 at 18–23; ECF No. 32 at 2–10). Therefore, Plaintiff has met her burden under the first prong of the *McDonnell Douglas* framework.

Under the second *McDonnell Douglas* prong, Defendant must "articulate a legitimate, non-discriminatory reason for the adverse employment action." *Viscik*, 800 A.2d at 833. Here, Defendant asserts Mitchell's team—those in charge of making hiring decisions for the HRTC role—considered Plaintiff "to be less qualified than the successful applicants for the HRTC position" and for that reason, "did not select her for the role." (Mitchell Certification (ECF No.

24-25) ¶ 12.) Plaintiff does not dispute Defendant has provided a non-discriminatory reason for terminating her. (ECF No. 29 at 25.) Because Defendant maintains Plaintiff was not terminated because of her age and articulates non-discriminatory reasons for her termination, the burden shifts back to Plaintiff to demonstrate Defendant's "stated reason is a pretext to discriminate against her." *See Arenas*, 790 F. Supp. 2d at 238; *McDonnell Douglas*, 411 U.S. at 804–05.

> If the employer
>
>> proffers a non-discriminatory reason [for the termination], the plaintiff does not qualify for a jury trial unless he or she can 'point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'

*Zive*, 867 A.2d at 1144 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). The non-moving party must then "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' *Ezold* [*v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)] and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" *Fuentes*, 32 F.3d at 765 (quoting *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638 (3d Cir. 1993)).

Plaintiff argues she has satisfied the first *Fuentes* prong[36] because: (1) evidence shows Plaintiff received positive reviews and praise from her clients; (2) Defendant retained employees that were younger and less qualified than Plaintiff for the HRTC position; (3) Defendant hired

---

[36] Plaintiff does not make any arguments under the second *Fuentes* prong. (*See* ECF No. 29 at 27–30.) All of Plaintiff's pretext arguments seek to demonstrate Plaintiff has "directly contradict[ed] Defendant's rationale for terminating Plaintiff and offer[ed] enough suspicion that a reasonable fact finder could conclude that [Defendant's] proffered rationale was not credible and pretext for discrimination." (*Id.* at 27.)

HRBPs prior to the transition to Workday, most of whom were younger than 40 years old; and (4) Defendant stated it was looking for "fresh new blood." (ECF No. 29 at 27–30.) The Court will assess each in turn.

First, directing the Court to a series of annual employee assessments from 2009, 2013, 2014, 2015, and 2016 (ECF No. 29-7), Plaintiff asserts she received positive reviews from Defendant and her clients during her tenure as an HRBP. (ECF No. 29 at 27.) However, during the process of making hiring decisions for HRTCs, it is undisputed that Mitchell's team only "reviewed each candidate's last performance review and . . . their resumes." (ECF No. 24-1 ¶ 73; ECF No. 29-1 ¶ 73.) The last performance review considered for hiring decisions was Plaintiff's 2016 review. (ECF No. 29-7 at 15–20.) DuShole, noted she "was very pleased with [Plaintiff's] efforts," "believe[d] she has been impactful" and "helpful," among several other positive comments and reviews. (*See id.*) However, DuShole also noted "[n]ext year will come with many changes as we transition to Workday. This could mean a redefining of HR roles so [Plaintiff] might have to decide where her future lies." (*Id.* at 19.) It is also undisputed that on a "one to three scale," DuShole ranked Plaintiff a "2-," where a "1+" ranking signified a "model HRBP." (ECF No. 24-1 ¶¶ 79, 82; ECF No. 29-1 ¶ 79.) Further, Plaintiff asserts Defendant listed Plaintiff as an HRTC for "FY 2018" on one of its HRTC alignment charts. (ECF No. 29 at 27; HRBP Alignment Charts for Fiscal Year 2018 (ECF No. 29-23).) However, the chart Plaintiff cites merely lists Plaintiff as an HRBP working on the Air Force account and reporting to Kozak, the Regional HR Leader. (*See* ECF No. 29-23.) Even if all of Plaintiff's prior performance reviews were considered during the hiring process and were universally positive, those reviews would not be sufficient on their own to establish pretext. *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 528 (3d Cir. 1992) ("Pretext is not established by virtue of the fact that an employee has received some

favorable comments in some categories or has, in the past, received some good evaluations."); *Hooker v. Novo Nordisk, Inc.*, Civ. A. No. 164562, 2020 WL 526165, at *6 (D.N.J. Jan. 31, 2020) ("That a plaintiff has previously performed well in a role does not prove that the plaintiff has performed well recently."); *Sullivan v. Nationwide Life Ins. Co. of Am.*, 720 F. Supp. 2d 483, 501 (D. Del. 2010) ("Even if Sullivan's prior managers had universally praised his performance, such reviews would not necessarily establish pretext."). Therefore, this first set of evidence, without more, is not sufficient to establish pretext.

Second, Plaintiff argues Defendant retained two employees—Alex Shapero ("Shapero") and Harriet Dade-Garvin ("Dade-Garvin") —who were younger and less qualified than Plaintiff. (ECF No. 29 at 27–28.) Regarding Shapero, Plaintiff asserts he was under 40 years old, did not have 10 years of experience, and did not have the same background as Plaintiff. (*Id.* at 27.) Plaintiff further asserts Dade-Garvin was also under 40 years old, given a "2-" rating by her managers, but was still given an HRTC position. (*Id.* at 28.) According to Plaintiff, because age was the only distinguishing factor between Shapero, Dade-Garvin, and Plaintiff, "a jury could reasonably conclude that Defendant's rationale for terminating Plaintiff from employment was pre-text for discrimination." (*Id.*)

While Shapero was younger and less qualified than Plaintiff, Defendant retained older employees—some even older than Plaintiff, but all over 40 years old—that were less qualified than her. Plaintiff was 48 when she interviewed and applied for the HRTC position, while Jarell was 58 years old, Nishelle Barnes ("Barnes") was 46, and Tanya Judge ("Judge") was 42. (ECF No. 29-10.) The job description for the HRTC position states "[a] Bachelor's degree in human resources, business administration, organizational development, or a related degree" is required. (HRTC Job Description ECF No. 29-27), at 4.) Jarrell received a Bachelor of Science in

Education, Barnes received a Bachelor of Arts in Sociology, and Judge received a Bachelor of Arts in English. (Mitchell Certification with Resumes of Jarrell, Barnes, and Judge (ECF No. 32-3).) That is, Jarrell, Judge, and Barnes, all over 40 years old, did not meet the education requirement for the HRTC position but were still selected for the position.

Further, it is undisputed the HRTC position was to "serve as an internal consultant to business leaders." (ECF No. 24-1 ¶ 70; ECF No. 29-1 ¶ 70.) While Shapero may not have had sufficient "years of experience" for the HRTC role, Shapero had a resume with recent consulting experience (ECF No. 29-26 at 2) and was described by Mitchell as a "consultant" (Mitchell's Memorialization of HRBP's Manager's Feedback (ECF No. 24-21), at 2) who performed a "range of HR counseling work" (ECF No. 29-26 at 3). Comparatively, Plaintiff's resume only lists she "consulted on HR policy" as a Human Resource Generalist in two positions she held nearly 20 years ago. (ECF No. 24-25 ¶ 13.) Further, Mitchell described Plaintiff as a "doer" rather than a "driver," and an "order taker" as opposed to a "consultant." (*Id.* at 12.) Therefore, while Shapero may have worked fewer years, his resume and reviews by Mitchell indicate his skills as a consultant aligned more closely with Defendant's needs for the HRTC position, especially when compared to Plaintiff. *See Dungee v. Ne. Foods, Inc.*, 940 F. Supp. 682, 689 (D.N.J. 1996) (finding that, in assessing pretext in the employment context, "the existence of baseline requirements . . . does not preclude an employer from considering additional, legitimate qualifications . . . and then deciding who is most capable of performing the job"). Defendant's decision to find Shapero more qualified for the HRTC position because of his relevant and recent experience as a consultant, despite not having the requisite years of experience, does not establish pretext. *Id.* ("[I]t is not this court's role to second-guess an employer's business judgment as to who is more qualified for the

job" because "it is the perception of the decisionmaker that is relevant" in deciding who is more qualified, "not the plaintiff's perception of herself.")

Regarding Dade-Garvin, Plaintiff argues age was the only distinguishing factor because Dade-Garvin received a "2-" rating and was noted by her manager to "have struggled with push back and compromises," had difficulty fully understanding issues, and was resistant to change. (ECF No. 29 at 28.) However, the facts indicate despite Dade-Garvin receiving the same rating as Plaintiff, managers also found Dade-Garvin had the potential to develop in a new role. (*See* ECF No. 24-21.) Dade-Garvin's manager noted she has "strong HR skills" and "has capability to be successful in new role, provided its directed." (*Id.*) DuShole did not similarly indicate Plaintiff showed potential for a new role. Instead, DuShole indicated an uncertainty about Plaintiff's future following the transition to Workday. (*See* ECF No. 29-7 at 19 (The "transition to Workday . . . could mean a redefining of HR roles so [Plaintiff] might have to decide where her future lies.").) Again, Plaintiff has not demonstrated  Defendant's proffered reason for not hiring her—that she was less qualified than the successful applicants for the HRTC position—"was so plainly wrong that it [could not] have been the employer's real reason" for not selecting her. *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997).

Next, Plaintiff argues Defendant's hiring of individuals under age 40 before the transition and its retention of all its employees under 40 years old after the HRTC interviews demonstrates a violation of the NJLAD. (ECF No. 29 at 29.) Additionally, Plaintiff points out the only individuals not retained for the HRTC position were 40 years of age or older. (*Id.*) This does not provide the full factual picture of Defendant's selection process for the HRTC position, as it is undisputed that "over 57% of those selected for HRTC positions were over 40, including three of the four oldest candidates, all of whom were older than Plaintiff." (ECF No. 24-1 ¶ 150; ECF No.

29-1 ¶ 150.) Since Defendant retained a majority of its older employees, it is even less likely Plaintiff can demonstrate pretext. *E.E.O.C. v. MCI Int'l, Inc.*, 829 F. Supp. 1438, 1461 (D.N.J. 1993) (finding no pretext when, after the adverse employment action, "four of the five remaining [employees] were in the protected age group" and noting "the sheer numbers belie any inference of age discrimination."); *see also Del Franco v. New York City Off-Track Betting Corp.*, 429 F. Supp. 2d 529, 540 (E.D.N.Y. 2006), *aff'd*, 245 F. App'x 42 (2d Cir. 2007) ("Plaintiff's claim that she was discharged because of her age is further weakened by evidence of OTB's continued employment of individuals within the protected age group.").

Lastly, Plaintiff contends Defendant's hiring of HRTCs over 40 years old after the internal interviews came while it was investigating the "fresh new blood" comment. (ECF No. 29 at 29.) However, courts have consistently found a comment about new blood does not establish age discrimination on its own. *Perry v. Prudential-Bache Sec., Inc.*, 738 F. Supp. 843, 853 (D.N.J. 1989), *aff'd*, 904 F.2d 696 (3d Cir. 1990) (finding comment that firm needed "new blood" to "mean nothing more than that Pru–Bache wanted to *change* employees, whether they be younger or older"); *Hodczak v. Latrobe Specialty Steel Co.*, 761 F. Supp. 2d 261, 271 (W.D. Pa. 2010), *aff'd*, 451 F. App'x 238 (3d Cir. 2011) (noting statement that employer wanted "new blood" was "not necessarily the equivalent of 'young' blood"); *Holshue*, 2006 WL 680878, at *3 (M.D. Pa. Mar. 16, 2006) ("The phrase 'new blood' does not on its face relate to age."). Because Plaintiff has not provided sufficient evidence of age discrimination, she has not adequately contradicted Defendant's "proffered legitimate reasons" for not selecting her for an HRTC position, such that "a reasonable factfinder could rationally find [Defendant's reasons] 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (quoting *Fuentes*, 32 F.3d at 765).

Accordingly, Defendant's Motion for Summary Judgment on Count I is **GRANTED.**

### B.    Disparate Impact (Count III)

Defendant argues Plaintiff's disparate impact claim fails because she cannot establish a prima facie case. (ECF No. 24-1 at 23–25.) Plaintiff argues genuine issues of material fact exist as to whether Defendant's actions had a disparate impact. (ECF No. 29 at 31–32.)

Disparate impact discrimination "involves employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Peper v. Princeton Univ. Bd. of Trs.*, 389 A.2d 465, 478 (N.J. 1978) (quoting *Int'l Brotherhood of Teamsters v. U.S.*, 431 U.S. 324, 335, 336 n.15 (1977)). New Jersey courts adopted this standard from the federal approach for disparate impact. *Gerety v. Atl. City Hilton Casino Resort*, 877 A.2d 1233, 1237 (N.J. 2005).

A discriminatory motive is not required to succeed on a theory of disparate impact. *Id.* at 1238. To establish a claim of disparate impact, the employee must "isolat[e] and identify[] the specific employment practices that are allegedly responsible for any observed statistical disparities." *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005) (citation omitted). This disparity must be "significant." *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 79–80 (3d Cir. 2017). The "significantly discriminatory impact" is evaluated "on a case-by-case basis." *Id.* at 81.

It is insufficient for the employee to "simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact." *Smith*, 544 U.S. at 241. The plaintiff must prove causation; "that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused" the harm alleged. *Watson v. Ft. Worth Bank & Tr.*, 487 U.S. 977, 994 (1988); *see also EEOC v. Greyhound Lines*, 635 F.2d 188, 193 (3d Cir. 1980) ("[A] policy does not have a disparate impact unless it is the cause of that

impact."). The statistical evidence "must be limited in scope in accordance with Fed. R. Civ. P. 26(b)(1) and tied to the allegations of plaintiff's complaint." *Kresefsky v. Panasonic Commc'ns & Sys. Co.*, 169 F.R.D. 54, 66 (D.N.J. 1996); *accord Petruska v. Reckitt Benckiser, LLC*, Civ. A. No. 14-3663, 2015 WL 9582142, at *3 (D.N.J. Dec. 29, 2015).

After a plaintiff makes a prima facie showing of disparate impact, the employer then must "articulat[e] some legitimate, non-discriminatory reason for its treatment of the employee." *Massarsky v. Gen. Motors Corp.*, 706 F.2d 111, 118 (3d Cir. 1983) (citation omitted). If the employer presents evidence of a lawful rationale for the employment action, then the plaintiff must show that the asserted reasoning "was merely a pretext for unlawful discrimination." *Id.* "The ultimate burden of persuasion remains on the plaintiff at all times; the defendant's burden is only to introduce sufficient evidence to create a genuine factual issue concerning the existence of a legitimate justification for the action." *Id.*

Plaintiff takes issue with the HRTC selection process as a whole, instead of "isolating and identifying" a specific employment practice, *Smith*, 544 U.S. at 241, since she asserts "[w]hile Defendant may have retained employees that were 40 years of age or older, the only employees adversely impacted by the transition to the HRTC position were those that were 40 years of age or older." (ECF No. 29 at 32.) It is undisputed that, "[a]t the time of Plaintiff's termination, the percentage of HRTCs who were over 40 (63.6%) nearly equaled the number of pre-transition HRBPs in that age group (65.2%), with a difference of only 1.6%." (ECF No. 24-2 ¶ 152; ECF No. 29-1 ¶ 152.) While Plaintiff repeatedly submits "100% of those HRBPs that were terminated by Defendant were over 40 and the average age (of termination) was 47.45 years old," this statistical disparity is not "sufficiently substantial" to raise an inference of causation because it ignores the fact that Defendant's selection of HRTCs resulted in practically the same percentage

of employees over 40 than existed before the selection process. (ECF No. 29-1 ¶¶ 150, 152.) Therefore, Plaintiff has not carried her burden in establishing causation and cannot succeed on her disparate impact theory.

According, Defendant's Motion for Summary Judgment as to Count III is **GRANTED.**

## C.    Intentional Infliction of Emotional Distress (Count IV)

Defendant argues Plaintiff's intentional infliction of emotional distress claim fails because she cannot establish she was subjected to any extreme and outrageous conduct, or that she suffered any severe emotional distress. (ECF No. 24-1 at 26–28.) Plaintiff argues genuine issues of material fact exist as to whether Defendant's conduct was severe enough to cause emotional distress. (ECF No. 29 at 33–35.)

To establish a claim for intentional infliction of emotional distress, a plaintiff must "establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." *Buckley v. Trenton Sav. Fund Soc.*, 544 A.2d 857, 863 (N.J. Sup. Ct. 1988). First, "the plaintiff must prove that the defendant acted intentionally or recklessly." *Id.* "For an intentional act to result in liability, the defendant must intend both to do the act and to produce emotional distress." *Id.* Second, the defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* Third, "the defendant's actions must have been the proximate cause of the plaintiff's emotional distress." *Id.* (citations omitted). Fourth, "the emotional distress suffered by the plaintiff must be so severe that no reasonable man could be expected to endure it." *Id.* (internal quotations omitted). "'Severe emotional distress means any type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so.'" *Ward v. Barnes*, 545 F. Supp. 2d 400, 414

(D.N.J. 2008) (quoting *Taylor v. Metzger*, 706 A.2d 685, 697 (N.J. 1998)). This tort is limited in scope and "'tolerates many kinds of unjust, unfair, and unkind conduct,'" which is "especially true in the employment context." *Horvath v. Rimtec Corp.*, 102 F. Supp. 2d 219, 236 (D.N.J. 2000) (quoting *Fregara v. Jet Aviation Bus. Jets*, 764 F. Supp. 940, 956 (D.N.J. 1991)); *Williams v. Verizon New Jersey, Inc.*, Civ. A. No. 21909350, 2020 WL 1227663, at *15 (D.N.J. Mar. 12, 2020) ("It is 'extremely rare' to find actionable IIED in the employment context" (citing *Griffin v. Tops Appliance City, Inc.*, 766 A. 2d 292, 297 (N.J. Super. Ct. App. Div. 2001)); *Polonsky v. Verizon Commc'ns, Corp.*, Civ. A. No. 09-4756, 2011 WL 5869585, at *16 (D.N.J. Nov. 22, 2011) ("Moreover, courts have consistently recognized that it is particularly difficult to establish intentional infliction of emotional distress in the employment context.").

Plaintiff asserts "genuine issues of material fact exist as to whether" Defendant's actions were "intentional and reckless and caused Plaintiff severe emotional distress" because "Plaintiff suffered increased stress, anxiety and depressive symptoms" as a result of losing her job. (ECF No. 29 at 34.) Further, Plaintiff argues "[t]he stressors of losing her job, caring for her children, surviving without [an] income, [and] losing job benefits all contributed to Plaintiff's emotional distress, which manifested itself in anxiety and depressive symptoms." (*Id.*) Relevantly, Plaintiff testified to the following:

> Q. Do you think there's anything extreme—do you think anyone at Booz Allen did anything to you that was extreme or outrageous?
> A. No. I mean, I guess you could say laying off all these people that are over 40, you know, was shocking, but nobody came up and slapped me or anything.
> Q. Do you think anybody at Booz Allen did anything that was intended to cause you emotional harm?
> A. I would say they weren't intending it, but I would say the impact of their decisions did cause a lot of anxiety.

(ECF No. 29-5 at 239:15–240:2.)

Based on her own testimony, Plaintiff concedes nobody at Defendant acted in an extreme or outrageous manner, or intended to cause her emotional harm. Plaintiff argues Defendant's actions "were intentional and reckless" because "Defendant denied Plaintiff the HRTC position despite her qualifications and their selection of younger less qualified candidates for the HRTC roles." (ECF No. 29 at 33.) However, Plaintiff makes this argument without providing citation to the record or caselaw holding similar situations have been found intentional or reckless. (*See id.*) According to this Circuit, "[i]n the context of a dismissal, it has been noted that 'while loss of employment is unfortunate and unquestionably causes hardship, often severe, it is a common event' and cannot provide a basis for recovery for intentional infliction of emotional distress." *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir. 1988) (quoting *Brieck v. Harbison–Walker Refractories*, 624 F. Supp. 363, 367 (W.D.Pa.1985), *aff'd. in relevant part*, 822 F.2d 52 (3d Cir. 1987)). Because Plaintiff merely argues Defendant acted intentionally or recklessly by terminating her, and concedes nobody acted intentionally or recklessly, Plaintiff has failed to demonstrate there are genuine issues of material fact as to whether Defendant acted intentionally or recklessly and caused Plaintiff severe emotional distress. Therefore, Plaintiff's claim for intentional infliction of emotional distress does not survive summary judgment.

Accordingly, Defendant's Motion for Summary Judgment on Count IV is **GRANTED**.[37]

---

[37] Count II of Plaintiff's Complaint alleges Aider and Abettor liability under the NJLAD. (ECF No. 1 ¶¶ 31–33.) Defendant argues Plaintiff's aiding and abetting claim fails for lack of an individual defendant and any discriminatory conduct. (ECF No. 24-1 at 25–26.) Plaintiff does not address her Aider and Abettor claim in her Opposition. (*See generally* ECF No. 29.) The NJLAD can impose liability for aiding and abetting unlawful discrimination practices. N.J. Stat. Ann. § 10:5-12(e). However, since the Court has not found actionable discrimination, "the Court need not address whether aider and abettor liability exists." *Hunter v. Deptford Bd. of Educ.*, Civ. A. No. 16-727, 2019 WL 4786032, at *8 (D.N.J. Oct. 1, 2019), *appeal dismissed*, Civ. A. No. 19-3521, 2020 WL 2061560 (3d Cir. Feb. 10, 2020).

**IV.** **CONCLUSION**

For the reasons set forth above, Defendant's Motion for Summary Judgment is **GRANTED**. An appropriate Order follows.


**Dated: April 30, 2021**


                                          */s/ Brian R. Martinotti*
                                          **BRIAN R. MARTINOTTI**
                                          **UNITED STATES DISTRICT JUDGE**